IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| SANDRA R. W.,[1] | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 18-cv-089-CJP[2] |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff, represented by counsel, seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for disability benefits in October 2013, alleging disability as of February 1, 2013. After holding an evidentiary hearing, ALJ Stephen M. Hanekamp denied the application on March 29, 2017. (Tr. 10-24). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely

---

[1] The Court will not use plaintiff's full name in this Memorandum and Order in order to protect her privacy. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.
[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c). See, Doc. 20.

complaint was filed in this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ did not properly assess the effects of plaintiff's fibromyalgia in that he misunderstood the nature of the disease, misstated evidence and ignored favorable evidence.

2. The ALJ ignored evidence supporting the diagnoses of lupus and rheumatoid arthritis.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes and regulations.[3] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20

---

[3] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes and regulations are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be

found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber

stamp for the Commissioner.   See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

**The Decision of the ALJ**

ALJ Hanekamp followed the five-step analytical framework described above. He determined that plaintiff had not worked at the level of substantial gainful activity since the alleged onset date.   She was insured for DIB through December 31, 2018.   He found that plaintiff had severe impairments of fibromyalgia, degenerative disc disease, degenerative joint disease of the right hip, mild right carpal tunnel syndrome, obesity, depression, anxiety, and PTSD.   He also found that there was insufficient medical evidence to support her allegation of lupus and rheumatoid arthritis.

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform work at the light exertional level, limited to occasional climbing of ramps and stairs; occasional balancing, stooping, kneeling, crouching, and crawling; no exposure to whole body vibration; frequent reaching, handling, and fingering; operation of right lower extremity controls for 30 minutes at a time with no limits on the use of foot pedals; simple routine tasks with the same changes every day; no direct interaction with the public; only occasional, superficial, interaction with supervisors and coworkers.

Based on the testimony of a vocational expert, the ALJ concluded that plaintiff could not do her past relevant work.   However, she was not disabled because she was able to do jobs which exist in significant numbers in the national

economy.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

### 1. Agency Forms

Plaintiff was born in 1970 and was 42 years old on the alleged date of onset. (Tr. 287). She said she stopped working on February 1, 2013, because it was too difficult for her to move. She had worked as an assistant deli manager, manager of an ice cream stand, and a waitress. (Tr. 291-292).

Plaintiff said she was unable to work because she was in chronic pain every day, she was unstable on her feet, she had panic attacks, she was unable to handle stress, and she had numbness and tingling in her feet, hands, legs, and arms. (Tr. 305). She also had anxiety, depression, and adult attention deficit disorder. (Tr. 310).

### 2. Evidentiary Hearing

Two evidentiary hearings were held. Plaintiff was represented by an attorney at both. (Tr. 38, 54).

At the first hearing in August 2016, plaintiff testified that she had pain all over her back, but worse in the low back. She had pain going into her right hip and numbness into her right leg and foot. She took Vicodin and Gabapentin. She

could sit for five to ten minutes and could stand for the same amount of time. She then had to change positons. (Tr. 57-59). She had migraine headaches three or four times a week. (Tr. 61). She was treated by Dr. Ying Du for fibromyalgia. Fibromyalgia caused pain in her shoulder blades, neck, low back, thighs, and lower legs. The pain comes and goes. (Tr. 62-63). She was treated for depression and anxiety, and she had three to four panic attacks a week. (Tr. 65).

At the second hearing in January 2017, a vocational expert (VE) testified. The ALJ asked him a hypothetical question which corresponded to the ultimate RFC findings. The VE testified that this person could not do plaintiff's past work, but she could do other jobs such as injection molder, press operator, and hand presser. (Tr. 44-47).

### 3.    Medical Records

Plaintiff was seen by Dr. Gangwani in early 2013. In February 2013, he noted diagnoses of depression, ADHD, and generalized anxiety disorder. He prescribed Wellbutrin and Adderall. However, because a urine drug screen came back negative for amphetamines, Dr. Gangwani stopped prescribing Adderall for her. He also noted that she failed to fill a Wellbutrin prescription. In August 2013, he noted her poor compliance and added a diagnosis of malingering – rule out diagnosis. (Tr. 375-390).

Plaintiff saw Dr. Davila, a rheumatologist, in 2013. In January, Dr. Davila noted plaintiff had a prior diagnosis of systemic lupus erythematosus (SLE), with recent negative serologies. There was "no evidence of SLE on recent bloodwork."

She continued to have livedo.[4] She complained of joint pain, including the right hip and knees. The doctor gave her an injection in her hip. In October 2013, plaintiff complained of right shoulder and neck pain. Dr. Davila recommended physical therapy and noted that she "also likely has fibromyalgia pain." She planned to increase the dosage of Gabapentin. (Tr. 392-402).

Dr. Davila saw plaintiff again in January 2014. Plaintiff complained of persistent pain in her hips, knees, thighs, neck and shoulders. On exam, she had multiple positive trigger points throughout the back and neck. The assessment was "significant pain complaints likely secondary to fibromyalgia versus osteoarthritis." The plan was to add Venlafaxine (Effexor) and to increase the dosage of Gabapentin. Dr. Davila noted that narcotics are not useful for treating fibromyalgia. (Tr. 475-477).

In May 2014, plaintiff saw Dr. Davila for persistent fibromyalgia symptoms and joint pain, as well as numbness in the fourth and fifth digits of the right hand. Dr. Davila added Lyrica to her other medications for fibromyalgia and ordered a nerve conduction study. (Tr. 478-479).

Plaintiff saw Dr. Stirnaman for evaluation of her possible right carpal tunnel syndrome. Her symptoms included difficulty forming a fist, loss of sensation in fingers and hand, and pain in the fingers. Dr. Stirnaman wrote "Given this

---

[4] "People with lupus may experience a lacy pattern under the skin called livedo reticularis. This pattern may range anywhere from a violet web just under the surface of the skin to something that looks like a reddish stain." https://www.hopkinslupus.org/lupus-info/lupus-affects–body /skin-lupus/, visited on October 29, 2018.

patients [sic] rather vague symptoms," he thought she should be evaluated by a neurologist. He also noted that her nerve conduction study was consistent with carpal tunnel syndrome. (Tr. 481-484).

In May 2014, plaintiff had a high reading on an erythrocyte sedimentation rate study. Normal range was 0 to 15; plaintiff's reading was 21. (Tr. 497).

Plaintiff's primary care physician was Dr. Hoelscher. In February 2014, he noted that she was being treated by Dr. Davila for fibromyalgia. On exam, her joints were generally tender. (Tr. 524). In May 2014, he noted chronic problems of depressive disorder, anxiety, lupus, and ADD. (Tr. 513). He saw her for fibromyalgia in June 2014. He noted that her rheumatologist was leaving soon. (Tr. 526).

Plaintiff saw Dr. Hoelscher in June 2015 for low back pain. She had gone to the emergency room the day before. Dr. Hoelscher noted, "She cannot think of anything she did unusual that would have stirred it up. It is not like her to have a bad back." On exam, she was very stiff and slow getting on the table. Straight leg raising was negative. The doctor noted that she was " clearly having some back spasms." (Tr. 858). An MRI of the lumbar spine done in June 2015 showed mild foraminal stenosis, right greater than left, from L4 to L6, and mild disc desiccation at L5-S1. (Tr. 866).

In January 2016, a physician's assistant at Dr. Hoelscher's office examined plaintiff and noted point tenderness to the lumbar spine, more to the right, and along the right buttock, right lateral thigh, and hip region. (Tr. 851). In February

2016, Dr. Hoelscher examined plaintiff and noted diminished sensation of the skin on the legs in a diffuse fashion and positive straight leg for reproduction of some pain.   (Tr. 850).

Dr. Hong took over as plaintiff's primary care physician in March 2016.   He noted tenderness of the lumbar spine on exam.   He prescribed Norco, which had previously been prescribed by Dr. Hoelscher.   (Tr. 905-908).

In May 2016, an MRI of the lumbar spine showed a very small left disc protrusion/herniation at L5-S1 without significant impingement, minimal disc bulging at L2-3, and minor bilateral lower lumbar facet changes without encroachment.   The report stated that mild facet changes at L4-5 did not appear to cause significant foraminal narrowing as described on the previous exam.   (Tr. 630).   Dr. Hong noted that the MRI did not explain her right hip and SI joint pain. (Tr. 922).   In August 2016, a neurosurgeon, Dr. MacGregor, examined plaintiff and determined that she had a disc bulge with annular tear at L5-S1.   She advised plaintiff that she did not have any severely pinched nerve roots that would require surgery at that point.   (Tr. 965-967).

Plaintiff began seeing Dr. Ying Du, a rheumatologist, in September 2014. She reviewed Dr. Davila's records and old lab work.   She noted that plaintiff had been tried on a number of medications for fibromyalgia and nothing worked. She assessed fibromyalgia, joint pain, and carpal tunnel syndrome on the right.   She prescribed Tizanidine (Zanaflex) for fibromyalgia.   On exam, all trigger points were positive except for left trochanter bursa, right elbow, and left scapular.   (Tr.

925-928).   Blood testing for anti-CCP was strongly positive at 72.5.[5]   (Tr. 945).
Rheumatoid factor was negative.   (Tr. 947).   In October, all trigger points were
positive.   (Tr. 931).   In March 2015, plaintiff complained of joint pain, numbness
in her extremities, and fatigue.   All trigger points were positive, with the right side
more tender than the left.   Dr. Du's assessment was fibromyalgia with moderate to
severe symptoms.   (Tr. 932-934).   In August 2015, plaintiff complained of back
pain, abdominal pain, insomnia, and fatigue.   All trigger points were positive.
(Tr. 935-937).   In February 2016, Dr. Du noted that plaintiff had a history of
positive anti-CCP testing, and she intended to repeat labs at the next visit.   All
trigger points were again positive.   (Tr. 938-941).

## Analysis

The Court agrees that the ALJ did not adequately explain his assessment of
plaintiff's fibromyalgia and ignored or misinterpreted relevant evidence.

Fibromyalgia is "a common, but elusive and mysterious, disease, much like
chronic fatigue syndrome, with which it shares a number of features. . . . . Its cause
or causes are unknown, there is no cure, and, of greatest importance to disability
law, its symptoms are entirely subjective. There are no laboratory tests for the
presence or severity of fibromyalgia."   *Sarchet v. Chater*, 78 F.3d 305, 306 (7th
Cir. 1996).   The principal symptoms of fibromyalgia are "pain all over," fatigue,
disturbed sleep, stiffness, and multiple tender points.   *Ibid*.

---

[5] This test is for the presence of cyclic citrullinated peptide (CCP) antibodies.   A positive result
"indicates a high likelihood of rheumatoid arthritis."   https://www.mayomedicallaboratories.
com/test-catalog/Clinical+and+ Interpretive/84182, visited on October 30, 2018.

The agency recognizes that fibromyalgia may be diagnosed in one of two ways. First, under the 1990 American College of Rheumatology Criteria for the Classification of Fibromyalgia, a diagnosis of fibromyalgia can be based on (1) a history of widespread pain; (2) at least 11 positive tender points on physical examination; and (3) evidence that other disorders that could cause the symptoms or signs were excluded, such as rheumatologic disorders. Second, under the 2010 American College of Rheumatology Preliminary Diagnostic Criteria, a diagnosis of fibromyalgia can be based on (1) a history of widespread pain; (2) repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems ("fibro fog"), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome; and (3) evidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded. SSR 12-2p; 2012 WL 3104869, *2-3.

The ALJ discussed fibromyalgia at Tr. 18. While he said that he "accepted" the diagnosis of fibromyalgia, he also said that the requirements of diagnosing fibromyalgia under either the 1990 or 2010 criteria have not been met. Thus, while he said he accepted the diagnosis, he also indicated that he doubted it.

The ALJ said that the trigger analyses in the file were not specific as to number or locations. That is incorrect. Dr. Du either specified that all trigger points were positive or she specified which ones were negative. See, Tr. 925-941. Dr. Du is a rheumatologist, which is the appropriate specialty to treat fibromyalgia.

*Sarchet*, 78 F.3d at 307.

The ALJ said that, in May and June 2014, providers at Alton Orthopedic said that plaintiff's symptoms were somewhat vague. The significance of that observation is unclear, since the symptoms of fibromyalgia are somewhat vague, i.e., pain all over. In any event, the ALJ's observation is incorrect. In fact, Dr. Stirnaman described her symptoms as somewhat vague in June 2014, but he was evaluating her for carpal tunnel syndrome, and it is clear that he was referring to her symptoms in that context and not in reference to fibromyalgia. See, Tr. 481.

The ALJ pointed out that plaintiff was seen for fibromyalgia-related joint pain in September 2014, but her sedimentation rate (ESR) was normal. However, ESR is not a test for fibromyalgia and a normal ESR does not cast doubt on a diagnosis of fibromyalgia. "Sed rate, or erythrocyte sedimentation rate (ESR), is a blood test that can reveal inflammatory activity in your body. A sed rate test isn't a stand-alone diagnostic tool, but it can help your doctor diagnose or monitor the progress of an inflammatory disease." https://www.mayoclinic.org/tests – procedures/sed-rate/about/pac-20384797, visited on October 31, 2018. The test can help confirm a diagnosis of conditions including rheumatoid arthritis and "can also help determine the severity of your inflammatory response and monitor the effect of treatment." *Ibid*.

The ALJ also observed that plaintiff had been prescribed "multiple medications for pain, none of which were narcotic or particularly strong." This is inaccurate in two respects. First, Dr. Davila, a rheumatologist who was treating

plaintiff's fibromyalgia, stated in her notes that narcotics are not useful for treating fibromyalgia. (Tr. 475-477). Therefore, the absence of prescribed narcotics does not undermine either the diagnosis or severity of plaintiff's fibromyalgia. Secondly, plaintiff was in fact prescribed Norco, a narcotic, but that was prescribed by her primary care physicians to treat her back pain, which they treated separately rather than as part of her fibromyalgia. (Tr. 905-908).

The ALJ's decision contains other misstatements or misinterpretations that worked to plaintiff's detriment. For example, at Tr. 17, the ALJ stated, "The claimant's testimony is not supported by the medical evidence of record. In fact, one of her providers stated outright on June 4, 2015 that it was 'not like her to have a bad back.'" This is a reference to Dr. Hoelscher's note. However, Dr. Hoelscher did not express any doubt that plaintiff was having back pain. He wrote in that same note that she was very stiff and slow getting on the table, and she was " clearly having some back spasms." (Tr. 858). The ALJ highlighted only one part of the doctor's note out of context and used it to discredit plaintiff. And, the ALJ referred twice to malingering (Tr. 19, 20), without clarifying that the mention of malingering occurred in the mental health records from 2013 and the notes actually stated "malingering – rule out diagnosis." (Tr. 375-390). This was a reference to plaintiff having tested negative for amphetamines despite having filled prescriptions for Adderall. Similarly, in discussing the consultative exam by Dr. Leung, the ALJ said that Dr. Leung noted a complaint of rheumatoid arthritis. The ALJ then said that there was no diagnosis of rheumatoid arthritis in the record, and that this was

a "self-assessment by the claimant herself." (Tr. 19). However, it is clear that plaintiff's rheumatologists considered a differential diagnosis of rheumatoid arthritis in the course of their diagnosis and treatment of fibromyalgia, as is indicated under both the 1990 and 2010 American College of Rheumatology Criteria cited above. Some of the test results suggested plaintiff might have rheumatoid arthritis; it was not a fabrication on her part.

While it is true that an ALJ is not required to discuss every piece of evidence in the record, it is well-established that an ALJ "may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014), collecting cases. Further, an ALJ's decision must be supported by substantial evidence, and the ALJ's discussion of the evidence must be sufficient to "provide a 'logical bridge' between the evidence and his conclusions." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009), internal citations omitted. The ALJ fails to build the requisite logical bridge where he relies on evidence which "does not support the propositions for which it is cited. " *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011). Here, the ALJ ignored evidence favorable to plaintiff, misstated or misconstrued evidence, and failed to build the requisite logical bridge by clearly explaining how he assessed plaintiff's fibromyalgia.

Remand is required where, as here, the decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012). The Court wishes to stress that this

Memorandum and Order should not be construed as an indication that the Court believes that plaintiff is disabled or that she should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## **Conclusion**

The Commissioner's final decision denying plaintiff's application for social security disability benefits is REVERSED and REMANDED to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE: November 1, 2018.**

**s/ Clifford J. Proud**
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**